Donald Wayne **ASHWORTH** and Cynthia Ashworth, individually and as husband and wife, Plaintiffs,

v.

**UNITED STATES of America,** Defendant.

**U–HAUL CO. OF SOUTHERN FLORIDA,** U–Haul Co. of Cleveland, and Republic Western Insurance Company, Plaintiffs,

v.

**UNITED STATES of America,** Defendant.

The **ASSOCIATION OF COMMUNITY MENTAL HEALTH/MENTAL RETARDATION PROGRAMS OF WEST VIRGINIA BENEFIT PLAN TRUST,** a foreign trust, Plaintiff,

v.

**UNITED STATES of America,** Defendant.

Nos. 89–10040–CIV, 90–10023–CIV and 91–10006–CIV.

United States District Court, S.D. Florida.

Aug. 27, 1991.

Preddy, Kutner, Hardy, Rubinoff, Brown & Thompson by Edward G. Rubinoff, Miami, Fla., for plaintiffs.

Dexter W. Lehtinen, U.S. Atty. by Carole M. Fernandez, Asst. U.S. Atty., Miami, Fla., for defendant.

ORDER GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING GOVERNMENT'S MOTION FOR PARTIAL SUMMARY JUDGMENT; ORDER DENYING GOVERNMENT'S MOTION TO DISMISS COUNTS III AND IV AND DENYING PLAINTIFFS' MOTION TO COMPEL

JAMES LAWRENCE KING, Chief Judge.

This cause comes before the court on a number of motions filed by the parties.

Included among these motions are the plaintiffs' motion for partial summary judgment, the defendant's motion for partial summary judgment, the defendant's motion to dismiss Counts III and IV of the plaintiffs' complaint, and the plaintiffs' motion to compel. At the pretrial conference held on April 19, 1991, the court conducted a hearing on the pending motions, allowing counsel to present oral argument and submit evidence in connection with the pending motions.

## I. FACTUAL BACKGROUND

On the evening of August 28, 1987, a tragic automobile accident occurred in the Florida Keys on the stretch of U.S. 1 known as the Seven–Mile Bridge. The accident involved a rented U–Haul vehicle driven by United States Coast Guard Seaman Thomas Nellis and a vehicle driven by Donald Wayne Ashworth. Donald Ashworth and his wife, Cynthia Ashworth, sustained extremely serious injuries as a result of the head-on collision.

The collision occurred on the evening of August 28, 1987, at approximately 8:45 p.m. Seaman Nellis was traveling north at a speed of about 45 mph when his vehicle veered into the southbound lane of traffic. Although Seaman Nellis' vehicle had been weaving a bit within its lane, it appears that the vehicle crossed lanes suddenly, at a relatively sharp 45–degree angle. The oncoming car, driven by Donald Wayne Ashworth and occupied by Cynthia Ashworth, was quickly struck by Seaman Nellis' rented vehicle. The collision occurred entirely within the Ashworths' lane of travel and within the emergency lane to its west. The vehicles came to rest partially within the southbound lane and partially within the emergency lane. The vehicles were just a few scant inches from the guard rail that separates the southbound lane of the Seven–Mile Bridge from a dangerous plummet into the Gulf of Mexico.

On the date of the accident, Seaman Nellis, who had been stationed aboard the Coast Guard Cutter *Ute*, was travelling from Key West, Florida to Riviera Beach, Florida. Earlier in the day, he had been granted leave from the *Ute*. He thereafter engaged in various social activities, including attendance at a function sponsored by the *Ute* Morale Committee, a visit with his friend and travelling companion, Jackie Brown, to a local Key West bar and restaurant, and a stop for a swim at the beach. Seaman Nellis then began his trip to Riviera Beach, Florida in a rented U–Haul vehicle.

Seaman Nellis' trip from Key West to Riviera Beach was occasioned by his transfer from the *Ute* to U.S. Coast Guard Station Lake Worth Inlet, Riviera Beach, Florida. Nellis had requested and received authorization to conduct a Do–It–Yourself (DITY) move of his personal belongings, and he had also been authorized to effect his change of duty station by privately owned conveyance. Nellis' travel orders provided for one day of travel time and one day of leave.

According to the testimony of Jackie Brown, Seaman Nellis had planned on reaching his new duty station on the night of August 28, 1987. There is also evidence that Nellis was expected to stop at his mother's home on that same evening. The new duty station was just 45 minutes beyond the home of Seaman Nellis' mother, where it appears that Seaman Nellis had considered temporarily storing the belongings he was moving on his DITY move.

## II. MOTIONS FOR PARTIAL SUMMARY JUDGMENT

### A. SUMMARY JUDGMENT STANDARDS

Rule 56(c) of the Federal Rules of Civil Procedure provides in pertinent part that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment is mandated against a party who has failed to make a showing sufficient to establish the existence of an element essen-

tial to that party's case, and on which the party will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). However, all reasonable doubts as to the facts are to be resolved in favor of the party opposing summary judgment. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Mercantile Bank & Trust Co. v. Fidelity & Deposit Co.,* 750 F.2d 838, 841 (11th Cir.1985).

## B. ANALYSIS

### 1. Scope of Employment

Under the Federal Tort Claims Act, the United States' liability for the acts of its employees is limited to those instances where a government employee is "acting within the scope of his or her employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b). As applied to members of the United States military, "acting within the scope of his or her employment" is defined as "acting in the line of duty." 28 U.S.C. § 2671. Yet, for purposes of the Federal Tort Claims Act, "acting in the line of duty" means no more than acting within the scope of employment under the law of the place where the act or omission occurred. *See Williams v. United States,* 350 U.S. 857, 76 S.Ct. 100, 100 L.Ed. 761 (1955). In the context of the plaintiffs' motion for summary judgment, it is therefore crucial to determine whether, under Florida law, Seaman Thomas Nellis was acting within the scope of his employment when the subject accident occurred.

Under Florida law, scope of employment is determined by the following three part test:

An employee's conduct is within the scope of his employment only if it is the kind he is employed to perform, it occurs substantially within the time and space limits of the employment and it was activated at least in part by a purpose to serve the master.

*Lawrence v. Dunbar,* 919 F.2d 1525, 1528 (11th Cir.1990) (citing *Rabideau v. State,* 391 So.2d 283 (Fla. 1st DCA 1980), *aff'd,* 409 So.2d 1045 (Fla.1982)).

In determining scope of employment, the first issue which this court must address is whether Seaman Nellis' conduct on the night of August 28, 1987 was of the kind he was employed to perform. The government contends that Seaman Nellis was not engaged in such conduct because he was not employed to move furniture, drive trucks, or possess a valid driver's license. Moreover, the government has heatedly argued that Florida cases on workmen's compensation should not be followed by this court in determining whether Seaman Nellis was engaged in conduct of the kind he was employed to perform.

While it is true that the policies attendant to workmen's compensation cases may sometimes require a more expansive interpretation of scope of employment than is called for in a respondeat superior situation, this court finds that no such expansive interpretation is needed to determine that Seaman Nellis was in fact engaged in the type of conduct he was employed to perform.[1] The government admits that "Coast Guard seamen are occasionally required to change their duty station." Moreover, the government admits that Seaman Nellis was authorized to move himself and his belongings to the new duty station—tasks which the government was otherwise required to perform. As a government employee, Seaman Nellis was *required* to make an election from among a limited number of options that the government provides to employees who are given permanent change of station orders. He chose a DITY move and travel by privately

---

1. The cases cited by the plaintiffs and the defendant, including workmen's compensation cases, serve to delineate the parameters of "scope of employment" under Florida law. Yet, each case involving scope of employment turns on the particular facts involved. It would be of little service to anyone for this court to engage in factually analogizing and distinguishing the plethora of cases on this subject. This court will instead apply the legal principles distilled from this body of Florida law to the specific facts involving Seaman Thomas Nellis.

owned conveyance. He was given a limited period of time in which to complete the authorized DITY move and change duty stations; one of the days he was allowed was not even considered leave or liberty. Nellis was required to follow certain procedures, and pursuant to the Joint Federal Travel Regulations, the Coast Guard Comptroller Manual, and Nellis' various travel-related orders, he was to be compensated for his travel and moving expenses and to be given a variety of allowances that included a $50.00 per diem allowance and a mileage allowance. The Coast Guard's own literature even informs its members that they may be "immune from individual suit when on a direct route ... from one duty station to the next" because "[a] member engaged in a DITY move is presumed to be performing official duties."

Although Seaman Nellis' day-to-day job activities do not require that he drive a truck, move his belongings, or hold a valid driver's license, as a member of the United States Coast Guard he has been hired to follow orders and travel to duty stations where his superiors order him to report and serve. While fulfilling such orders under the circumstances existing in this case, Seaman Nellis was engaged in conduct of the kind he was hired to perform.

Having determined that Seaman Nellis was engaged in conduct of the kind he was hired to perform, this court must next determine whether Seaman Nellis was substantially within the time and space limits of his employment when the accident on the Seven–Mile Bridge occurred. As an initial matter, there is no doubt that Seaman Nellis' travel on the Seven–Mile Bridge put him on a direct route to his new duty station in Riviera Beach. In fact, it is the only route by which anyone can travel on dry land from Key West to Riviera Beach. Given the undisputed facts in this case, Seaman Nellis was clearly within the spatial limits of his employment when the accident occurred.

The plaintiffs are faced with a more involved problem, however, when addressing whether Seaman Nellis was substantially within the time limits of his employment. According to evidence from various Coast Guard officers, Coast Guard policies and regulations held Seaman Nellis to be on either liberty or noncharageable leave when the accident occurred. The plaintiffs have set forth other regulations, asserting that the date of the accident should have been deemed a day of duty for Seaman Nellis. The government has conceded that Coast Guard terminology technically characterized the date of the accident in such terms, but has argued that this characterization is relatively meaningless. Yet, the government points out that on August 29, 1987, the Coast Guard considered Seaman Nellis to be on leave, and he would not have been considered to be on a day of travel until August 30, 1987. Seaman Nellis was not required to report to his new duty station until midnight on August 31, 1987.

 Although the technical status that the Coast Guard assigns to a seaman may be instructive as to whether he is within the time limits of his employment, that label does not control the inquiry made under Florida law. Seaman Nellis was authorized to perform his DITY move and change of duty station at any time after his detachment from the *Ute*. Applicable regulations were to have compensated him whether he travelled on August 28, August 29, or August 30. The precise day on which Seaman Nellis discharged his orders was irrelevant; he was within the time limits of his employment whenever he chose to perform his DITY move and change duty station—as long as he reported to his new duty station *no later than* midnight on August 31, 1987. His orders implicitly contemplated an earlier arrival.

 The government also contends that Seaman Nellis was not substantially within the time and space limits of his employment because he could not have arrived at Riviera Beach, Florida in time to take his belongings to the new duty station.[2] Yet,

**2.** The only way to reach the new duty station apparently involves taking a ferry that normally ceases operation during the time period ranging from 11:00 p.m. to midnight. Moreover, the government has set forth that Seaman Nellis

the government appears to concede that Seaman Nellis could have traveled to the new duty station, without his belongings, and reported. In any event, even if Seaman Nellis would not have reached U.S. Coast Guard Station Lake Worth Inlet on August 28, that conclusion would not place Seaman Nellis outside the time and space limits of his employment when he had been given until midnight on August 31, 1987 to report. He was not required to travel in one uninterrupted stage to his new duty station. Similarly, evidence that Seaman Nellis was expected to stop at his mother's home in Boca Raton, at least temporarily, does not remove him from the time and space limits of his employment. Assuming that Seaman Nellis intended to pass by his mother's home on the way to the new duty station, that would have been no more than a slight deviation—if in fact it was a deviation.[3] More importantly, however, at the time of the accident, Seaman Nellis was not engaged in any conduct that could have been remotely colorable as a deviation or departure. He was proceeding on a direct course from his former duty station to his new duty station, thereby fulfilling his travel orders.

Finally, this court must determine whether Seaman Nellis' conduct was activated, at least in part, by "a purpose to serve the master." The discussion involving the first part of the Florida three part test should reveal that Nellis' travel to Riviera Beach and his accompanying DITY move were activated by a purpose to serve the Coast Guard. His acts were in fulfillment of his orders and were discharging transportation obligations otherwise undertaken by the Coast Guard. In addition, the court notes that both the Joint Federal Travel Regulations and the regulations set forth in the Coast Guard Comptroller Manual evince

that a policy determination has been made that travel by privately owned conveyance is beneficial to the government and should not normally be limited or prohibited. The regulations dealing with these moves are almost exclusively concerned with the economics of the move—costs, expenses, weight calculations, reimbursements, cash advances, etc. The eligibility requirements for the program similarly reveal a focus on optimizing economic considerations. The regulations affecting these changes of duty station and the accompanying monetary allowances reveal that an economic determination has been made that non-transoceanic moves by private conveyance are advantageous to the government.

In accordance with the foregoing discussion, this court grants summary judgment for the plaintiffs on the issue of Seaman Nellis' scope of employment.

*2. Negligence and Comparative Negligence*

■ As an initial matter, this court grants summary judgment for the plaintiffs on the issue of Seaman Nellis' negligence in connection with the August 28, 1987, head-on collision. Not only do the uncontested facts conclusively establish Seaman Nellis' negligence in connection with the incident, but at the April 19, 1991 pretrial conference, the government also conceded that Seaman Nellis did, in fact, negligently operate the rented vehicle and that his operation of the rental U–Haul vehicle was a proximate cause of the injuries suffered by the plaintiffs. The government disputes, however, that Seaman Nellis was the sole cause of the accident and resulting injuries. Instead, the government contends that Donald Wayne Ashworth was comparatively negligent under the facts of this case. The court thus

would not have been allowed to use the ferry to transport his personal belongings after dark.

**3.** Slight deviations do not relieve an employer of its liability for acts of an employee committed within the scope of employment. *See, e.g., Western Union Telegraph Co. v. Michel,* 120 Fla. 511, 163 So. 86 (1935). Evidence suggests, however, that Seaman Nellis had considered leaving some of his personal belongings at his mother's

home for temporary storage. Temporary storage of personal belongings and household goods is expressly contemplated by government regulations as attendant to a change of duty station, and actions to effect such storage in connection with travel orders and permanent change of station orders would not place Seaman Nellis outside the time and space limits of his employment.

turns to that portion of the plaintiffs' motion that seeks summary judgment on the issue of comparative negligence.

The government argues that Donald Wayne Ashworth negligently operated his vehicle on the Seven–Mile Bridge. In fact, in presenting the argument at the hearing before this court, the government made much of arguing that Mr. Ashworth had "the last clear chance" to avoid the collision. The government argued that inconsistencies in the deposition testimony of Mr. Dale Wilson, the only living witness with any appreciable recollection of the collision, made the issue of comparative negligence one that must go to a jury.

The court fully appreciates that issues of negligence and comparative negligence should ordinarily be left to a jury and should not normally be resolved on a motion for summary judgment. Yet, the court is similarly cognizant of the mandates of summary judgment: where there is no genuine issue of material fact, a court shall enter summary judgment as a matter of law. Here, the government has persistently argued that Mr. Ashworth could have taken some evasive action to avoid the head-on collision. In this respect, the government contends that the testimony involving the incident allows for various scenarios involving different times for reaction. Yet, the government was totally incapable of offering any theory on how Mr. Ashworth could have avoided Seaman Nellis' oncoming vehicle. Assuming, arguendo, that Mr. Ashworth could have reacted more quickly and applied the brakes a few seconds earlier, it is not disputed by the government that such earlier action would not have avoided the collision with the oncoming vehicle. Any attempt to veer to the left would have caused the Ashworth vehicle to travel head-on into oncoming vehicles in the northbound lane. An attempt to veer sharply to the right would have apparently caused the Ashworths to barrel into the Seven–Mile Bridge's railing, either colliding with it and Seaman Nellis' vehicle or breaking through the protective barrier and plummeting into the Gulf of Mexico.

Moreover, the government could not provide this court with any reasonable course of action by which Mr. Ashworth could have acted so as to either avoid the accident or ameliorate the damage. In fact, when questioned by the court, the government admitted that it had no identifiable factual theory addressing the government's position that the Ashworths were comparatively negligent. The government simply reiterated that the facts surrounding the accident and the asserted inconsistencies in Mr. Wilson's testimony should be submitted to a jury for a determination as to whether the Ashworths were comparatively negligent.

Should this court adopt the government's argument, it would appear that nearly every case of negligence would have to go to a jury on the issue of comparative negligence—whether or not the facts clearly establish that there is no factually viable theory to support comparative negligence. Rule 56 simply does not support this position. Moreover, the positioning of the vehicles in this case, evidenced by the photographs submitted at the pretrial conference, together with the undisputed facts involving the manner in which Seaman Nellis' was operating his vehicle, conclusively establish that the Ashworths were not in any way comparatively negligent. Accordingly, the plaintiffs are entitled to summary judgment on both of the liability issues—negligence and comparative negligence.

### 3. Indemnification

The government has moved for partial summary judgment on the indemnification claims of U–Haul of Southern Florida, U–Haul of Cleveland, and Republic Western Insurance Co. (collectively referred to as "U–Haul"). The government's own presentation of the facts, however, reveals that there is a genuine issue of material fact as to the fault and culpability of U–Haul. While the initial rental paperwork was prepared in Seaman Nellis' name, John Jurgensen, another crewman serving aboard the *Ute*, picked up the truck from U–Haul. Under these facts, the issue of U–Haul's consent and authorization to Sea-

man Nellis' use of the rented vehicle remains a genuine issue of material fact, and the government's motion for partial summary judgment on the indemnification issue must therefore be denied.

### III. OTHER PENDING MOTIONS

 Two other motions remain pending in this case. The first is the government's motion to dismiss Counts III and IV of the plaintiffs' complaint. In Counts III and IV, the plaintiffs sought to establish the liability of the United States for the injuries suffered by the plaintiffs on grounds other than respondeat superior. However, because this court has already granted summary judgment for the plaintiffs on the issues of liability, relief pursuant to Counts III and IV has become moot, as has the motion to dismiss Counts III and IV.

The other motion that remains pending, the plaintiffs' motion to compel, is similarly rendered moot by this order. Through their motion to compel, the plaintiffs sought to discover evidence relevant to the issue of the government's liability for the injuries suffered by the Ashworths. Because liability has already been determined by this order, the report sought by the plaintiffs no longer appears to have any relevance. Accordingly, the motion to compel has also become moot.

### IV. CONCLUSION

After a careful review of the various matters addressed in this order, and after careful consideration of the parties' submissions and oral argument, this court

ORDERS and ADJUDGES that the plaintiffs' motion for partial summary judgment be, and the same hereby is, GRANTED;

ORDERS and ADJUDGES that the government's motion for partial summary judgment be, and the same hereby is, DENIED;

ORDERS and ADJUDGES that the government's motion to dismiss Counts III and IV be, and the same hereby is, DENIED AS MOOT; and

ORDERS and ADJUDGES that the plaintiffs' motion to compel be, and the same hereby is, DENIED AS MOOT.

DONE AND ORDERED.