**ST. PAUL GUARDIAN INSURANCE COMPANY, as subrogee of Alice I. Cherry, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**No. 98–14320–CIV.**

United States District Court, S.D. Florida, Fort Pierce Division.

Oct. 17, 2000.

Marc T. Millian, Michaud Buschmann Fox & Mittelmark PA, Boca Raton, FL, for Plaintiff.

Maureen Donlan, Assistant United States Attorney, United States Attorneys Office, Miami, FL, for Defendant.

### ORDER

K. MICHAEL MOORE, District Judge.

THIS CAUSE came before the Court upon Defendant's Motion for Summary Judgment (DE # 30) and Plaintiff's Cross–Motion for Summary Judgment (DE # 36).

UPON CONSIDERATION of the motions, responses, and the pertinent portions of the record, and being otherwise fully advised in the premises, the Court enters the following Order.

### Background

Plaintiff St. Paul Guardian Insurance Company ("Plaintiff" or "St. Paul"), as subrogee of Alice I. Cherry, filed the instant case against Defendant United States of America ("Defendant" or "United States") under the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq.* This matter arises out of an automobile accident on May 20, 1995 involving Cherry and Keith Sloane.

At all times relevant to this action, Sloane was enlisted in the United States Naval Reserve. As a Naval Reservist, Sloane was required to report to the Naval Air Station in Jacksonville, Florida one weekend every month for active duty training. Additionally, Sloane was required to report for two continuous weeks of active duty training once a year, at a naval air station selected by the Navy.

On May 3, 1995, Sloane was issued orders by the Department of the Navy, ordering him to report to the Naval Air Station in Key West, Florida no later than May 21, 1995 at 7:30 a.m. for his two-week active duty training session. Sloane had been given the option of selecting his mode of travel to the two-week training session. Sloane elected to drive his own personal vehicle to the training session, and this mode of travel became part of the May 3, 1995 orders.

Pursuant to the orders dated May 3, 1995, Sloane's active duty began on May 20, 1995, and ended on June 1, 1995. Sloane was subject to the Uniform Code of Military Justice throughout this period. Also pursuant to the May 3, 1995 orders, Sloane was paid for a total of 13 days, including one paid day for his travel to the Naval Air Station in Key West. Furthermore, Sloane was entitled to mileage reimbursement, travel expenses, and a per diem for his travel to Key West.

Sloane left his home in Middleburg, Florida at approximately 1:00 p.m. on May 20, 1995 in his private vehicle to travel to Key West. While traveling south on I–95 in Marion County, Florida, Sloane was involved in an accident with an automobile driven by Cherry. After some delay resulting from the accident, Sloane proceeded to Key West, arriving at the Naval Air Station that same day, May 20, 1995, at approximately 10:00 p.m.

Cherry brought an action for damages against St. Paul, her uninsured motorist carrier. St. Paul reached a settlement with Cherry for the sum of $600,000.00. In return for the settlement, Cherry executed a Complete Release and Hold Harmless Agreement, dated November 5, 1997 ("November 5, 1997 Release"), which provided as "Releasees":

> [T]he St. Paul Guardian Insurance Company, the St. Paul Fire and Marine Insurance Company, Keith William Sloane, the United States Government, the United States Navy, and the United States Department of Defense, as well as each of their sister, parent, successor, predecessor, affiliated corporations, divisions and any other agents, servants, employees, officers, directors, shareholders, independent contractors, creditors, agents and assigns.

(November 5, 1997 Release ¶ 5). On or about November 13, 1998, Cherry executed a revised Complete Release and Hold Harmless Agreement ("Revised Release"). The Revised Release did not include Sloane, the United States Government, the United States Navy, or the United States Department of Defense as releasees. (*See* Revised Release ¶ 5).

In its motion for summary judgment, the United States contends that the instant subrogation action should be dismissed because: (1) the Court lacks jurisdiction over the subject matter of this action because Sloane was not acting within the scope of his employment with the Navy at the time of the subject accident; and (2) Plaintiff's claim against the United States is barred by the November 5, 1997 Release executed by Cherry.

Plaintiff filed a cross-motion for summary judgment, asserting that: (1) Sloane was acting within the scope of his employment with the Navy at the time of the

subject accident; and (2) the November 5, 1997 Release does not bar its subrogation claim because it is the owner and real party in interest of the subrogation claim against the United States, the November 5, 1997 Release does not unambiguously bar this action, and, to the extent that the November 5, 1997 Release did release the United States, it did so as a result of a mutual mistake by St. Paul and Cherry, the parties to the settlement.

## *Discussion*

### I. Summary Judgment Standard

The standard to be applied in reviewing a summary judgment motion is stated unambiguously in Rule 56(c) of the Federal Rules of Civil Procedure:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Summary judgment may be entered only where there is no genuine issue of material fact. *See Twiss v. Kury,* 25 F.3d 1551, 1554 (11th Cir.1994). The moving party has the burden of meeting this exacting standard. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). An issue of fact is "material" if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case. *Allen v. Tyson Foods, Inc.,* 121 F.3d 642, 646 (11th Cir.1997). It is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party. *Id.*

In applying this standard, the district court must view the evidence and all factual inferences therefrom in the light most favorable to the party opposing the motion. *See id.* However, the non-moving party: may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.

Rule 56(e), Fed.R.Civ.P. "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

■ In other words, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). In determining whether this evidentiary threshold has been met, the trial court "must view the evidence presented through the prism of the substantive evidentiary burden" applicable to the particular cause of action before it. *Anderson,* 477 U.S. at 254, 106 S.Ct. 2505. If the non-movant fails to adduce evidence which would be sufficient, when viewed in a light most favorable to the non-movant, to support a jury finding for the non-movant, summary judgment may be granted. *See id.* at 254–55, 106 S.Ct. 2505.

■ Additionally, the non-moving party must "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial and requires the court to grant the motion for summary judgment. *See id.*

### II. Scope of Employment

■ Under the Federal Tort Claims Act ("FTCA"), the United States' liability for the acts of its employees is limited to

those instances where a government employee is "acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b). As applied to members of the United States military, "acting within the scope of his office or employment" is defined as "acting in the line of duty." 28 U.S.C. § 2671. For purposes of the FTCA, "acting in the line of duty," in turn, means acting within the scope of employment under the respondeat superior law of the place where the act or omission occurred. *See Bennett v. United States,* 102 F.3d 486, 489 (11th Cir.1996). Thus, the Court must first determine whether, under Florida law, Sloane was acting within the scope of his employment with the Navy when the subject accident occurred.

■ Under Florida's respondeat superior law, an employee is acting within the scope of his employment if his conduct: (1) is the kind he is employed to perform; (2) occurs substantially within the time and space limits of the employment; and (3) was activated at least in part by a purpose to serve the master. *See Lawrence v. Dunbar,* 919 F.2d 1525, 1528 (11th Cir. 1990) (*citing Rabideau v. State,* 391 So.2d 283 (Fla.Dist.Ct.App.1980), *aff'd,* 409 So.2d 1045 (Fla.1982)); *Ashworth v. United States,* 772 F.Supp. 1268, 1271 (S.D.Fla. 1991).

The first issue is whether Sloane's conduct on May 20, 1995 was of the kind he was employed to perform. As a Naval Reservist, Sloane was employed to follow orders, including orders directing him to report for two weeks of annual training at a station selected by the Navy. By orders dated May 3, 1995, Sloane was so ordered to report to the Naval Air Station in Key West, Florida no later than May 21, 1995 at 7:30 a.m. for his two weeks of annual training. The orders directed travel to the training session via Sloane's privately owned vehicle. Pursuant to the orders, Sloane was to be paid by the Navy one day of constructive travel for his drive to Key West, and was entitled to be reimbursed for his mileage and per diem because he was driving his private automobile. Sloane was on duty status and subject to the Military Code of Justice once he entered his vehicle and began driving to Key West on May 20, 1995. Had Sloane not elected to drive his personal vehicle to the training, the United States would have had to provide transportation for him. Under the circumstances, Sloane, while fulfilling his orders by traveling to Key West in his private automobile, was engaged in conduct of the kind he was hired to perform. *See Ashworth,* 772 F.Supp. at 1272 (holding that a United States Coast Guard seaman involved in an accident while moving himself in a privately owned conveyance to his new duty station pursuant to orders was engaged in conduct of the kind he was hired to perform, and was acting within the scope of his employment).

■ The case of *Holloway v. United States,* 829 F.Supp. 1327 (M.D.Fla.1993), upon which the United States relies, is distinguishable, and does not support a contrary conclusion. In *Holloway,* the court held that a Naval Reservist involved in an accident on his return home from training following dismissal of his unit was not within the scope of his employment with the United States. *Id.* at 1329. The *Holloway* court specifically noted that the Naval Reservist was no longer employed on inactive duty or subject to the Uniform Code of Military Justice at the time of the accident. *Id.* In the instant case, however, Sloane was on duty status and subject to the Uniform Code of Military Justice at the time of the accident. Significantly, the *Holloway* court relied upon the "going and coming" rule, which generally holds that an employee merely going to or coming from work in his own car is not in the course of employment. *Id.* at 1329–30. However, the "going and coming" rule is inapplicable to the facts of this case, as such rule is premised on the notion that the employee has not yet commenced his duties while en route to work. Pursuant

to his orders dated May 3, 2000, Sloane was not "going to work," but was, for purposes of this inquiry, already "at work," doing that which he had been ordered to do, while traveling to the Naval Air Station in Key West. *See 'Hinson v. United States,* 257 F.2d 178, 182 (5th Cir. 1958) (applying Georgia law).[1]

As to the second issue, the Court finds that the accident occurred substantially within both the time and space limits of Sloane's employment as a Naval Reservist. While Sloane's orders did not require him to report at the Naval Air Station in Key West until May 21, 1995 at 7:30 a.m., the record evidence establishes, and common sense dictates, that the Navy anticipated Sloane's travel on May 20, 1995 (*see* Lt. Brownell Deposition at 13), even making a room available for him for when he arrived at the base on that date. (*See* Sloane Deposition at 24). As such, Sloane was within the time limits of his employment. *See Ashworth,* 772 F.Supp. at 1272 (holding that a Coast Guard seaman was within the time limits of his employment while traveling three days before the date he was ordered to report to his new duty station, where orders implicitly contemplated an earlier arrival). Furthermore, there is no evidence suggesting that Sloane was acting beyond the space limits of his employment on May 20, 1995. At the time of the accident, Sloane was traveling on I–95, on a direct route between his home in Middleburg, Florida and the Naval Air Station in Key West, Florida.

Finally, Sloane's conduct on May 20, 1995 was clearly activated by a purpose to serve the Navy. As previously discussed, Sloane was traveling on this date in fulfillment of his orders directing him to report to the Naval Air Station in Key West for his two weeks of annual training. Based

upon the foregoing discussion, the Court finds that Sloane was acting within the scope of his employment with the Navy when the subject accident occurred.

### III. Release of United States

■ In its motion for summary judgment, the United States contends that, even if Sloane was acting within the scope of his employment, Plaintiff's claim against the United States is barred by the November 5, 1997 Release. On November 5, 1997, in return for a settlement with St. Paul in the amount of $600,000, Cherry executed the release, which included as releasees "the United States Government, the United States Navy, and the United States Department of Defense ..." (November 5, 1997 Release ¶ 5). The November 5, 1997 Release was prepared by counsel for St. Paul and forwarded to Cherry's attorney, Jay Jacknin. The instant action is a subrogation action brought by St. Paul, as subrogee of Cherry, against the United States.

■ The Court finds that Paragraph 5 of the November 5, 1997 Release clearly and unambiguously releases all claims against the United States. Plaintiff points to Paragraph 10 of the November 5, 1997 Release, which recites Cherry's assignment to St. Paul of "any and all claims, and/or claims of action she [possessed] against any entity potentially responsible for her injuries." (*See* November 5, 1997 Release ¶ 10). Even assuming, *arguendo,* that such language creates ambiguity in the November 5, 1997 Release, under general rules of construction, the specific language of Paragraph 5, specifically releasing the United States, controls the general language contained in Paragraph 10. *See Western Oil Fields, Inc. v. Pennzoil United, Inc.,* 421 F.2d 387, 389 (5th Cir.1970).[2]

---

1. As the United States concedes, there are additional significant factual differences between the *Holloway* case and the instant case. For instance, in *Holloway,* the Naval Reservist drank eight beers and made seven stops on his trip home, none of which were related to his military duty. *See Holloway,* 829 F.Supp. at 1328.

2. In *Bonner v. City of Prichard,* 661 F.2d 1206, 1207–1209 (11th Cir.1981) (*en banc*), the Eleventh Circuit adopted as binding precedent the decisions of the Fifth Circuit rendered prior to October 1, 1981.

Furthermore, ambiguities are construed against St. Paul, the drafter of the November 5, 1997 Release. *See Zapata Marine Service v. O/Y Finnlines, Ltd.*, 571 F.2d 208, 209 (5th Cir.1978); *Hurt v. Leatherby Ins. Co.*, 380 So.2d 432, 434 (Fla.1980). Similarly, statements on the enclosure portion of the settlement check, stating that it was "leaving subrogation rights open" do not alter the clear meaning of the November 5, 1997 Release.

▮▮▮▮ The Court further finds that the release of the United States in the November 5, 1997 Release bars this subrogation action by St. Paul. As stated in *High v. General American Life Ins. Co.*, 619 So.2d 459 (Fla.Dist.Ct.App.1993):

> When [an insured] execute[s] a release of the [tortfeasors], he [can] no longer assert any claim against them arising out of the automobile accident. [The subrogee of the insured] stands in the shoes of its insured and can have no greater rights ... and thus is likewise barred by the release. We think the law is clear that if one who sustains loss as a result of negligence or wrongdoing of another releases the tortfeasor, an insurer subrogated to the right of the insured party is barred by that release.

*Id.* at 461 (citations omitted). As subrogee, St. Paul stands in the shoes of Cherry, and is barred by her release. The Court is unpersuaded by Plaintiff's assertion that it is the real party in interest and owner of its subrogation claim and cannot be deprived of such claim by the release executed by Cherry. St. Paul was a party to the settlement and, indeed, drafted the document releasing the United States.

▮▮▮▮ Plaintiff asserts that, even if the November 5, 1997 document released the United States, it was the result of a mutual mistake. In support, Plaintiff points to the Revised Release executed by Cherry on November 13, 1998, which did not include the United States as a releasee, and an affidavit by Jacknin, counsel for Cherry, executed contemporaneously with the Revised Release. In the affidavit, Jacknin attests that he had been aware of St.

Paul's intent to pursue a subrogation action against the United States and had not intended to release the United States at the time of the November 5, 1997 Release. (Jacknin Affidavit ¶¶ 5, 8).

▮▮▮▮ The November 5, 1997 Release cannot be reformed in the absence of mutual mistake. *Newman v. Metropolitan Dade County*, 576 So.2d 1352, 1353 (Fla. Dist.Ct.App.1991); *American Fire & Indem. Corp. v. State Farm Automobile Ins. Co.*, 483 So.2d 122, 123 (Fla.App.1986). Generally, the question of intent is a matter left to the trier of fact for determination. *See American Fire*, 483 So.2d at 123. In this non-jury case, where the material evidentiary facts relating to this issue are not disputed, the Court may grant summary judgment if trial would not enhance its ability to draw inferences and conclusions. *See Coats & Clark, Inc. v. Gay*, 755 F.2d 1506, 1509–10 (11th Cir. 1985) (*quoting Nunez v. Superior Oil Co.*, 572 F.2d 1119, 1123–24 (5th Cir.1978)).

In his deposition, when questioned about the circumstances surrounding the execution of the Revised Release and affidavit, Jacknin conceded that he did not know if St. Paul intended to pursue a claim against the United States at the time of the November 5, 1997 Release. (Jacknin Deposition at 19–20). Jacknin further testified that, at the time of the execution of the November 5, 1997 Release, he had no reaction to the clause releasing the United States, as his only concern at that time was that his client's interests were protected. (*Id.* at 8–9, 20–21). Such evidence leads the Court to conclude that there was no mistake made by Jacknin, but only by St. Paul's attorney. *See American Fire*, 483 So.2d at 123. As there was not a mutual mistake between the parties, but merely a unilateral mistake, Plaintiff is not entitled to reform the November 5, 1997 Release. Accordingly, Plaintiff's cause of action against the United States is barred as a matter of law.

## CONCLUSION

Based on the foregoing, it is ORDERED AND ADJUDGED as follows:

(1) Defendant's Motion for Summary Judgment is hereby GRANTED; and

(2) Plaintiff's Cross–Motion for Summary Judgment is hereby DENIED.